IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**KENNETH D. ROBERTS**

               Plaintiff,                                               CV-09-336-KI

     v.                                                  OPINION AND ORDER

**MICHAEL J. ASTRUE**, Commissioner of Social
Security,

               Defendant.

KING, Judge:

      Plaintiff Kenneth Roberts brings this action for judicial review of a final decision of the

Commissioner of Social Security denying his applications for supplemental security income (SSI)

payments under Title XVI of the Social Security Act.  The court has jurisdiction under 42 U.S.C.

§§ 405(g), 1383c(3).  The Commissioner's decision is affirmed.

## BACKGROUND

Roberts was forty-seven years old at the time of the administrative hearing.  Admin. R. 21.[1]
He earned a graduate equivalency degree (GED).  *Id.*  Roberts worked as a fisherman, boat mechanic,
apartment manager, welder, boat skipper and engineer.  *Id.*  at 21, 27-29, 158-159.  He alleges
disability due to carpal tunnel disease, back pain and Hepatitis C.  Roberts filed for disability on
October 17, 2005, alleging disability since April 1, 2002.  His application was denied initially and on
reconsideration.  A hearing was held before an Administrative Law Judge (ALJ) on April 17, 2008.
The ALJ issued an opinion on May 28, 2008, finding Roberts not disabled, which is the final decision
of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*,
66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected . . .  to last for a continuous period of not less than 12
 months. . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining
whether a person over the age of 18 is disabled within the meaning of the Act.  20 C.F.R.  §416.920,
*Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At step one, the Commissioner determines whether the
claimant has engaged in any substantial gainful activity (SGA) since the alleged onset of disability.
20 C.F.R.  §416.920(b).  If the claimant has engaged in SGA, he is not disabled.  *Id.*  If the claimant

---

[1]  Citations to "Admin. R." refer to the page(s) indicated in the official transcript of the
administrative record filed with the Commissioner's Answer.

has not engaged in SGA, the analysis proceeds.  The Commissioner determines at step two whether the claimant has a severe impairment.  An impairment is severe if it significantly limits the claimant's ability to perform basic work activities.  20 C.F.R.  §416.921.  The burden to show a medically determinable severe impairment is on the claimant.  *Bowen v. Yuckert*, 482 U.S. at 146.   At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Id.* at 141; 20 C.F.R.  §416.920(d).  The criteria for these listed impairments are enumerated in 20 C.F.R.  pt. 404, subpt. P, app. 1. (Listing of Impairments).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R.  §416.945, Social Security Ruling (SSR) 96-8p.  At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past.  If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled.  20 C.F.R.  §416.920(f).

If the claimant cannot perform his past relevant work, the analysis proceeds to step five.  At step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy.  *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R.  §416.920(g).  Here the burden of production shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do.  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If the Commissioner meets this burden, then the claimant is not disabled.  *Id.,* 20 C.F.R.  §416.966.

## ALJ'S FINDINGS

The ALJ applied the five step disability determination analysis and found at step one that Roberts had not engaged in any SGA since October 17, 2005.  Admin. R. 11.  At step two, she determined that Roberts has the medically severe impairments of hearing loss, carpal tunnel syndrome and degenerative disc disease.  *Id.*  The ALJ found at step three that Roberts did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app.1.  *Id.*  at 12.

The ALJ found Roberts has the RFC to lift and/or carry ten pounds frequently and twenty pounds occasionally; and to stand, walk and sit up to six hours in an eight hour day.  She found Roberts cannot climb ropes, ladders, or scaffolding, and can occasionally stoop, crouch or crawl.  The ALJ found Roberts can perform frequent handling and fingering, but must avoid hazards where full grip strength may be needed for safety.  In addition, she found Roberts should avoid work environments with a high level of noise that could further damage his hearing.  *Id.*  at 13.

At step four, the ALJ found Roberts could not perform his past relevant work.  *Id.*  at 15.  Roberts has limitations on his ability to perform all light work, so the ALJ solicited the testimony of a vocational expert (VE).  The VE testified there were several jobs in the national economy an individual with Robert's age, education, past relevant work, and RFC could perform.  *Id.*  at 35-39.  Based on the VE's testimony the ALJ found there were significant jobs in the national economy that Roberts could perform and was therefore not disabled.  *Id.*  at 16.

**STANDARD OF REVIEW**

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for "determining credibility, resolving conflicts in the medical testimony and resolving ambiguities." *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193.

**DISCUSSION**

Roberts alleges his waiver of counsel was invalid. He challenges the ALJ's determination of his RFC by alleging the ALJ improperly assessed the medical evidence, his credibility, and lay witness testimony. Roberts also asserts the ALJ erred at step five by not including all of his limitations in the hypothetical questions given the VE.

**I.     Medical Background**

Roberts was seen at the Sutter Coast Hospital Emergency Room (ER) on February 23, 2005, for low back pain and dark stools. Admin. R. 203-213. His x-rays were normal and he was

advised to follow up with a local provider and given Dilaudid, Phenergan and a prescription for

Vicodin. He returned to the ER in May 2005, with complaints of headaches, vision changes, low

back pain, and a finger laceration from a power saw. *Id.* at 194-202. A CT scan of his brain was

normal; x-rays of his hand were normal, but showed two small metallic foreign body densities in

the fourth finger. His finger was cleaned and dressed and he was given Demerol with Phenergan,

Dilaudid, and prescriptions for Keflex, Ibuprofen, and Vicodin. On September 21, 2005, Roberts

went to the Bay Area Hospital complaining of left rib and hip pain. *Id.* at 176-180. It was noted

that he was a self-employed fisherman who fell through a tarp covered hatch. No fractures were

seen on x-rays and he was advised to ice the area, rest for a few days, and was given a prescription

for Vicodin.

Roberts went to the Sutter Coast Hospital ER on September 28, 2005, with dental pain,

left forearm pain, and hip pain. *Id.* at 187-193. He said he fell through an open hatch while

helping a friend fix his boat and landed on his forearm. X-rays of the arm were normal. He was

advised to stay on his antibiotics for dental abscess and pain until the prescription was finished.

Roberts was given Demerol and Phenergan and a prescription for Norco and Amoxicillin. He

returned to the Bay Area Hospital on October 4, 2005, with tingling in his upper extremities. *Id.*

at 171-172. Dr. Veldstra, the ER physician, noted Roberts fell a few weeks previously and had

some pain in his hip and ribs. He noted Roberts had no trouble or pain in his neck and had worse

tingling on his right side. A CT scan was normal and an MRI showed a bit of posterior disc bulge

on the left, C4-5 with slight narrowing of the left neural foramen. Roberts was given a Medrol

dosepak, Neurontin, and Norco. He was advised to follow up with Dr. Parvin, an orthopedic

spine specialist.

Dr.  Parvin, of the Oregon Coast Spine Institute, saw Roberts on October 13, 2005.  *Id.*  at 223-227.  She diagnosed severe carpal tunnel syndrome, greater on the left than right; cervical spondylosis with disk/osteophyte complex contributing to neck pain and upper extremity radiculopathy.  Dr.  Parvin noted a history of Hepatitis C, renal dysfunction, stomach ulcers, poor dentition, and a current abscess.  She advised Roberts that surgical intervention would not relieve his numbness and weakness in the arms.  Dr.  Parvin recommended nerve conduction studies with Dr.  Coelho to determine whether the source of the neurocompression was neck or carpal tunnel.  She also recommended steroid injections.  Dr.  Coelho saw Roberts the same day and noted the nerve conduction studies indicated severe bilateral carpal tunnel syndrome and bilateral small fiber peripheral neuropathy clinically.  *Id.*  at 221-222.  He gave Roberts an intratunnel cortisone injection on the left side.

Roberts returned to the Sutter Coast Hospital ER on October 17, 2005, for dental infection, pain in his neck, wrist, and chest wall.  *Id.*  at 182-186, 248-249.  He was advised to follow up with a dentist and diagnosed with carpal tunnel syndrome and chronic neck pain.  Roberts was given pain medication although he was noted to have past visits with drug seeking behavior.  Dr.  Coelho saw Roberts on October 31, 2005, and noted a history of bilateral carpal tunnel syndrome and axial neck pain.  *Id.*  at 215-216.  He further noted that Roberts found no relief from the cortisone injections.  Dr.  Coelho noted that Hepatitis C can produce small peripheral neuropathy which might be adding to the carpal tunnel problem.  He prescribed Ultracet, Skelaxin, and Nortriptyline.

Dr.  Parvin saw Roberts on November 8, 2005, regarding surgery for carpal tunnel release.  *Id.*  at 275-276.  Dr.  Parvin noted Roberts had severe carpal tunnel syndrome, left greater than

right, and cervical spondylosis with degenerative changes contributing to neck pain and upper

extremity radiculopathy.  Roberts requested a postponement of the surgery until February so he

could work through the crab fishing season.  Dr.  Coelho gave Roberts steroid injections on

December 2, 2005.  *Id.*  at 274.

Roberts returned to the Sutter Coast Hospital ER on February 14, 2006, complaining of

generalized weakness and worse neck and back pain.  *Id.*  at 242-247.  He was diagnosed with a

probable virus, chronic neck and back pain, and given a prescription for Vicodin.  Roberts

returned to the Sutter Coast Hospital ER on April 16, 2006, because he was out of pain

medications and had an exacerbation in his neck and back pain.  *Id.*  at 239-241.  He also

complained of acute urinary frequency.  Dr.  Saunders, the ER physician, advised Roberts to rest,

do no bending or lifting, use ice packs and return if the pain worsened.  Roberts requested

medications but was told to follow up with a family physician.

On July 5, 2006, Roberts saw family nurse practitioner (FNP) Boyle at the Brookings

Clinic for neck pain, low back pain, and difficulty holding objects.  *Id.*  at 342. He requested pain

medications and a second opinion from Dr. Parvin.  He was referred to Dr.  Purtzer and given

medications.  Roberts was taken by ambulance to Sutter Coast Hospital ER on March 8, 2007, due

to chest pain and complaints of back pain.  *Id.*  at 262-268.  His laboratory tests were normal and

he had a mostly normal musculoskeletal exam.  "When the patient realized he had no

transportation home and would not be receiving any narcotics, he became adamant about leaving

as soon as possible because he had to 'walk back' to Brookings."  *Id.*  at 263.  He was given

prescriptions for Motrin and Vicodin.

Dr. Coelho saw Roberts on May 11, 2007, and noted the most significant components to Roberts' condition were catastrophic social circumstances and depression. *Id.* at 272-273. He gave Roberts prescriptions for Flexeril and Wellbutrin and noted Roberts wanted another visit with Dr. Parvin. On May 31, 2007, FNP Guthridge, of the Brookings Clinic, examined Roberts. *Id.* at 337-338. She noted he had been told he had Hepatitis C and had a history of headaches and work injuries to the cervical and lumbar spine. FNP Guthridge assessed lumbar radiculopathy, shoulder pain, cervical radiculopathy, carpal tunnel syndrome ,and Hepatitis B and C. She ordered MRIs, laboratory work, and prescribed Methadone. Roberts saw FNP Guthridge on June 7, 2007, and complained of chronic pain and bladder problems. *Id.* at 334-335. She noted Roberts had fair pain relief with the Methadone. On July 17, 2007, FNP Guthridge saw Roberts for medication refills. *Id.* at 333. She noted he was doing very well with his dose of Methadone but it only lasted eight hours, and he requested a dose change to three times a day. FNP Guthridge also noted Roberts was more active, getting more work done, and was more rested. She reviewed his MRIs which showed severe changes in situ at C4-5, a left sided bulge at C5-6, and a negative lumbar MRI. Roberts returned to the clinic the next day for poison oak rash obtained from trying to get his goats out of blackberry bushes. *Id.* at 332.

Dr. Parvin saw Roberts on July 27, 2007, and noted he had bilateral carpal tunnel syndrome, spondylosis/degenerative changes in the cervical and lumbar spine with variable degrees of mild to moderate stenosis, Hepatitis C, and a history of substance abuse. *Id.* at 270-271. She noted there were no good surgical options and Roberts needed palliative care. Dr. Parvin noted,

> I feel that he is awfully young at 46 to consider him totally disabled, but by the same token as a result of his rough life history (substance abuse, heavy physical labor) in combination with his current medical and psychological issues that he may not be able to workup (sic) full capacities full time (sic). I advised him that if he, based on his symptoms, can tolerate some level of light duty working long term that he can pursue those activities. On the other hand if he is absolutely unable to do so, then he needs to look in to other options.

*Id.* at 271.

FNP Guthridge saw Roberts on August 22, 2007, for chronic pain, depression, and frequency of voiding at night. *Id.* at 320-321. She noted he was doing fair on the dose of Methadone, but he needed to take it when getting up in the morning in order to walk. FNP Guthridge further noted he complained of not being able to sit for a long time, needing to lie down during the day and that walking caused severe pain. She noted he was irritable, depressed, and stated activity caused his hands and arms to go numb. While he had benefitted from Terazosin, those benefits had decreased. She considered starting Roberts on Cymbalta for pain management and depression.

FNP Guthridge noted Roberts had a questionnaire form from his attorney. She spent thirty minutes reviewing the form with Roberts and having him respond to the questions on the form. *Id.* at 320. FNP Guthridge returned the questionnaire form from Roberts' attorney on August 22, 2007. *Id.* at 323-329. She saw Roberts on September 3, 2007, for refill of his pain medications and treatment for nocturia. *Id.* at 319. FNP Guthridge noted Roberts was doing fair with his dose of Methadone but complained that activity caused his hands and arms to go numb. She referred him to Dr. Walker.

Dr. Cink, an opthomalogist, examined Roberts on September 4, 2007, and noted he had normal vision when given glasses. *Id.* at 281. Dr. Walker, of the Medford Neurological and

Spine Clinic, examined Roberts on September 18, 2007. *Id.* at 283-289. He noted Roberts had

total body pain with no clear pain generator and no definitive diagnosis; and C5 and C6 foraminal

stenosis with no clear signs or symptoms of radiculopathy. Dr. Walker stated surgical

intervention would not be helpful and he did not see a clear treatment plan other than physical

therapy and pain management. *Id.* at 286.

FNP Guthridge saw Roberts on September 28, 2007. *Id.* at 317. She noted he had been

doing fine with his dose of Methadone, but had a flare up of pain because of doing work to get his

home ready for winter. FNP Guthridge noted his pain completely interferes with normal work,

and that he considers normal work to be commercial fishing. Roberts saw FNP Guthridge on

November 26, 2007, for a refill of pain medications. *Id.* at 315. She noted he had increased pain

after trying to help someone at the port; and that he had times when he was extremely short of

breath. Roberts requested an inhaler and stated he was helped by using a friend's inhaler. FNP

Guthridge assessed chronic obstructive pulmonary disease (COPD).

Roberts underwent a sleep apnea study on November 30, 2007, which revealed no

significant apneas. *Id.* at 290-292. Dr. Kraii performed a cystoscopy on December 6, 2007,

which was normal. *Id.* at 293. He sent a letter to FNP Guthridge on December 12, 2007, and

noted Roberts nocturia and voiding problem may be caused by a stray sphincter spasm. *Id.* at

312. Dr. Kraii suggested trying Valium to see if there was improvement. FNP Guthridge saw

Roberts on December 19, 2007, and noted he complained about his level of pain, memory

problems, and breathing difficulties. *Id.* at 308-309. He stated the Methadone was not providing

enough relief and also requested a prescription for an inhaler.

GNP Guthridge saw Roberts on January 21, 2008, for medication refills. *Id.* at 304-305. He complained that his pain was worse in severe weather and he did not get enough relief from Methadone. FNP Guthridge noted he had not been using non steroid anti-inflammatory drugs, such as Ibuprofen. She noted he had gotten a three-pronged cane, which he found useful. FNP Guthridge saw Roberts on February 4, 2008, for medication refills and a letter for disability purposes. *Id.* at 302. She noted he was getting some relief with Methadone and was using Prilosec for his gastroesophogeal reflux disease (GERD). FNP Guthridge further noted he had not used alcohol since June as he had overdosed in early 2007. She also noted he appeared agitated.

FNP Guthridge wrote a letter on February 18, 2008, stating Roberts' health problems included spondylosis/degenerative changes in the spine, bilateral carpal tunnel syndrome, COPD, sleep apnea, Hepatitis B and C, intermittancy of urinary flow with nocturia, a history of liver failure, hyperlipidemia, migraine head aches, alcoholism in remission, reflux esophagitis, and generalized osteoarthrosis. *Id.* at 299. She stated his pain results in an inability to be productively employed and "just carrying in two bags of groceries results in exacerbation of pain and results in a need for complete bed rest." *Id.*

Roberts was seen at the Brookings Clinic on February 20, 2008, to renew medications. *Id.* at 295-296. It was noted he complained of severe leg aches and sharp pain in the wrists and ankles; was overweight; spoke loudly; was agitated; moved with effort from sitting to standing; used a cane; and had a labored gait. Roberts was seen at the North Bend Medical Center on February 14, 2008, for a hearing test. *Id.* at 390-392. He was diagnosed with moderate to severe loss of hearing in both ears with excellent word understanding. It was noted that he was a good

candidate for hearing aids in both ears and that he should use hearing protection when exposed to loud noise.

## II.     Absence of Counsel

Roberts asserts his waiver of the right to counsel is invalid.  He alleges the ALJ did not follow all the procedures in the Social Security Administration's internal policy manual and did not call the lay witness.  Roberts further asserts that he did not understand the vocational expert's (VE) testimony enough to ask a hypothetical question.  The Commissioner responds that the legal issue is not the waiver of representation but whether Roberts demonstrated prejudice or unfairness because the ALJ failed to meet her duty in this case.

"[A]bsence of counsel alone would not be sufficient grounds for remand...The claimant must demonstrate prejudice or unfairness in the administrative proceedings to be entitled to relief by way of remand."  *Hall v. Sec'y of Health, Education, and Welfare,* 602 F.2d 1372,1378 (9th Cir. 1979)(citations omitted).  The ALJ has a duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts" and diligently elicit favorable as well as unfavorable facts.  *Vidal v. Harris,* 637 F.2d 710, 713 (9th Cir. 1981)(The ALJ did not fulfilled this duty because there was evidence the unrepresented claimant could not read, had mental retardation, and these limitations were not included in the questions to the VE).

The Social Security Administration's Hearings, Appeals, and Litigation Law Manual (HALLEX), cited by Roberts, outlines some sample questions to ask an unrepresented claimant to ensure an informed choice is made regarding representation.  HALLEX 1-2-6-52, available at 1993 WL 643033.  However, the HALLEX "does not prescribe substantive rules and therefore does not carry the force and effect of law."  *Moore v. Apfel,* 216 F3d. 864, 868 (9th Cir. 2000).

Most of the questions in the HALLEX are to ascertain whether the claimant received and understood information from the Social Security Administration (SSA) regarding the issues to be considered at the hearing and claimant's right to representation.  HALLEX 1-2-6-52, available at 1993 WL 643033  The ALJ has discretion regarding the content of the exchange but must ensure the claimant is capable of making an informed choice.  *Id.*

Roberts was represented by counsel prior to the administrative hearing.  He signed an acknowledgment of receipt of the Notice of Hearing letter from the SSA which explained the hearing, issues to be covered, and his right to representation.  Admin. R.  at 84.  Roberts has a GED and there is no evidence of an inability to read or understand.  The hearing record indicates the following exchange:

| | |
|---|---|
| ALJ: | However, you do have the right to have an attorney or someone else assist you and I noted that you'd had an attorney who then, decided he didn't want to drive down here or something. |
| CLMT: | He lied to me.  He didn't re-file and said he did. |
| ALJ: | So anyway, if you want to have additional time to, to get someone to assist you, there are people locally who will do it and if you want to I would reschedule this, probably this summer.  You wouldn't have to wait as long as you had to before.  It's just when I've had somebody who's attempted to get an attorney and then attorney backs out on them, I kind of want to make sure they know they, they can.. |
| CLMT: | Right.  You know, I understand.. |
| ALJ: | have an opportunity to do that. |
| CLMT: | Your honor. |
| ALJ: | We can also go ahead today.  It's just up to you what you'd rather do. |
| CLMT: | I'd rather go ahead today, if you don't mind. |
| ALJ: | No, that's fine. |

*Id.*  at 19.

14 - OPINION AND ORDER

After the ALJ questioned Roberts she asked him if he wanted his friend to testify. *Id.* at 34. Roberts said no, and then said his friend took him to appointments and understood the rough life he had been through in the boating industry. *Id.* When the ALJ examined the VE, she asked for a description of each job and asked Roberts if he would have any problems with the job. *Id.* at 36-40. Roberts responded to the questions and asked questions of the VE concerning certain jobs. *Id.* At the end of the hearing the ALJ asked Roberts if he wanted to say anything more. Roberts made some statements about his previous work history and medical problems *Id.* at 40-42.

Roberts assertion that his waiver of counsel is invalid is without merit. He has not demonstrated any prejudice that resulted from his lack of counsel. The ALJ fulfilled her duty to elicit facts favorable and unfavorable. She informed him of his right to counsel, to call his witness, to participate in the hearing, and to provide new medical evidence. *Id.* at 19-42. Roberts clearly understood and declined his right to representation and to call his witness. He participated in the hearing, commented on his inability to perform the jobs proposed by the VE, discussed his witness, and gave a final statement. Roberts' assertion that he did not understand the VE testimony or propose a hypothetical to the VE which resulted in prejudice is without merit. Roberts commented on the VE's testimony and gave reasons for his inability to perform the jobs. He does not demonstrate why a proposed hypothetical question would make a difference in the outcome. "Prejudice is not demonstrated by merely speculative eventualities." *Hall v. Sec'y of Health, Education and Welfare,* 602 F.2d at 1378. Roberts' waiver of counsel is valid.

III.    **RFC**

Roberts asserts the ALJ erred in determining his RFC by failing to properly assess the medical evidence.  He also contends the ALJ erred in discounting his credibility and the credibility of a lay witness.

**A.  Medical Evidence**

Roberts alleges the ALJ failed to properly comment on the opinions of Drs. Coelho, Parvin, and Saunders and thereby improperly rejected them.  The ALJ cited the medical records of Drs. Coelho and Parvin in her determination of severe impairments at step two.  Admin. R. 11. She found that Roberts had carpal tunnel syndrome and degenerative disc disease.  Roberts argues that Dr.  Coelho noted Robert may also have small fiber neuropathy from his Hepatitis C. However, Dr.  Coelho does not state whether this resulted in more limitations to Roberts' functioning than he already experienced from his carpal tunnel syndrome.  The ALJ resolved step two in favor of Roberts and concluded there were no additional functional limitations caused by the Hepatitis C.  Dr.  Coelho's note is not inconsistent with this finding.  The ALJ also incorporated gripping limitations into Roberts RFC.  Any error of omission in the ALJ's discussion was harmless.  *Burch v. Barnhart,* 400 F.3d 676, 682-683 (9th Cir. 2005)(ALJ omission of obesity from severe impairments was not prejudicial because step two was resolved in claimant's favor and ALJ considered obesity in making RFC decision).

Roberts asserts that Dr.  Parvin's opinion that Roberts might not be able to perform his work full time but might be able to do light duty work was not properly considered by the ALJ. However, this opinion is not inconsistent with Roberts' RFC which is light duty.  Roberts' also asserts that Dr.  Parvin found surgery might not be effective for Roberts.  The ALJ noted Roberts

had declined carpal tunnel release surgery because it would interfere with crabbing season.

Admin. R. 11.  Roberts asserts this statement indicates the ALJ discounted his symptoms.

However, the ALJ mentioned this in her determination at step two, where she found that carpal

tunnel was a severe impairment.

Dr. Saunders was an ER physician who examined Roberts on April 16, 2006, for neck and

back pain and urinary frequency.  *Id.*  at 239-241.  His exam noted four out of five grip strength

and some paraspinal muscular spasm.  *Id.*  at 240.  He noted Roberts stated his pain was worse

over the last few days and he could not get out of bed without pain medications.  Dr. Saunders

recommended Roberts follow up with a family doctor, rest, do no bending or lifting, use ice

packs, and to return if he got worse.  *Id.*  Dr. Saunders medical notes do not provide any

discussion of long term limitations related to Roberts' medical condition.  The ALJ's failure to

mention these notes does not change the determination of Roberts' RFC.

Social security regulations specify that the most weight is given to the opinions of treating

physicians, followed by examining physicians, and the least amount of weight is given to

nonexamining experts.  *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).  The ALJ did

not reject the opinion of Roberts' physicians.  Rather, the diagnoses of these physicians were

incorporated into the limits of Roberts' RFC.  These physicians did not recommend limitations in

addition to those in the RFC.  The Commissioner acknowledges the ALJ erred in not mentioning

each physician specifically, but asserts it is harmless error.  It is harmless error as it would not

change the result of Roberts' RFC or affect his credibility determination.  *Parra v. Astrue,* 481 F.

3d 742, 747 (9th Circ. 2007).

17 - OPINION AND ORDER

Roberts also asserts the ALJ erred in rejecting the opinion of FNP Guthridge provided in a questionnaire form.  The opinion of a nurse practitioner is not considered a medical source who can provide evidence to establish an impairment.  20 C.F.R.  § 416.913(a).  However, the opinion of a nurse practitioner may be used to show the severity of an impairment.  20 C.F.R.  § 416.913(d).  The ALJ gave little weight to the opinion of FNP Guthridge because she found it based primarily upon Roberts' subjective complaints and inconsistent with medical findings.  The ALJ noted, "Ms. Guthridge's notes indicate that she had the claimant respond to questions on the form.  This would suggest that her opinion is not based on observed objective measurements of the claimant's abilities, but rather, the claimant's own report of abilities."  Admin. R. 14, 320.  The ALJ further noted Roberts' claims of the severity of his impairments were discounted.

The ALJ may reject physician opinions, whether or not controverted, when they are brief, conclusory, and not supported by the record as a whole or clinical findings.  *Thomas v. Barnhart,* 278 F.3d 947, 957, (9th Cir. 2002), *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F. 3d at 1195.  An ALJ may also reject physician opinions that rely primarily on a claimant's subjective complaints which are properly discounted.  *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir. 1989).  The ALJ can certainly reject a nurse practitioner's opinion if it relies on properly rejected subjective complaints.  As discussed below, the ALJ properly discounted the severity of Roberts' subjective complaints.

Roberts objects to the way in which the ALJ weighed the medical evidence.  However, the ALJ findings were based on substantial evidence and free from legal error.  The court must uphold the ALJ's findings, even if evidence exists to support more than one rational interpretation of the

evidence.  *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d at 1039-1040.

### B. Roberts' Testimony

The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).  Roberts has medically determinable impairments which could produce his symptoms. When there is an underlying impairment and no evidence of malingering, An ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).  The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

When making a credibility evaluation, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment.  *Smolen v. Chater*, 80 F.3d at 1284-1285.  The ALJ found Roberts' physical impairments limited his functioning capacity and could reasonably result in pain symptoms.  Admin. R.  14.  However, the ALJ found the extent of the limitations claimed by Roberts not to be consistent with the medical record or the record as a whole.  *Id.*  The ALJ noted the objective medical records showed impairments but not of a severity that would preclude all work.  She noted Roberts' x-rays and MRI in 2005 noted mild degenerative changes without evidence of fracture or subluxation.  *Id.*  at 12.  The ALJ noted that later x-rays and MRIs

indicated further disc degeneration. *Id.* She further noted the 2007 opinion of Dr. Walker, a spine specialist. *Id.* Dr. Walker noted Roberts reported total body pain with no clear pain generator and no definitive diagnosis. Dr. Walker also noted C5 and C6 foraminal stenosis with no clear signs or symptoms of radiculopathy. *Id.* at 286.

The ALJ may also employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Smolen v. Chater,* 80 F.3d at 1284, SSR 96-7p The ALJ found Roberts' assertion that his hands had been "completely dead" since September 2005, with an inability to lift anything, inconsistent with his statement in September 2006, that he could lift up to thirty pounds, and thus undermined his credibility. Admin. R. 14, 100, 140.

The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Smolen v. Chater,* 80 F.3d at 1284, *Thomas v. Barnhart,* 278 F. 3d at 959. The ALJ found the level of daily activities reported by Roberts was inconsistent with an inability to do any work. The ALJ noted Roberts took care of his daily needs, did laundry, and took care of two pets. Admin. R. 14.

The ALJ considered the medical record, Roberts' prior inconsistent statement, and his daily activities and concluded the allegations of Roberts regarding the limiting effects of his symptoms were not supported. She found Roberts has functional and pain limitations which prevent him from sustaining strenuous and demanding activities, but does not prevent him from doing any work, particularly those within his capacity. *Id.* at 14, 15. The ALJ considered

20 - OPINION AND ORDER

appropriate factors and drew reasonable inferences from substantial evidence in the record in

assessing Roberts' credibility.

C.    **Lay Witness Testimony**

Roberts asserts the ALJ erred in rejecting the testimony in a form submitted by Michael

Grogan regarding Roberts' limitations.  If an ALJ wishes to discount lay witness testimony, he

must give reasons that are germane to each witness.  *Dodrill v. Shalala*, 12 F.3d at 919.  Mr.

Grogan stated in September, 2006, that Roberts neck and hands prevent him from doing "just

about anything."  Admin. R.  122.  He noted that because of pain, Roberts could not see, hear,

kneel, sit, walk, climb stairs, lift, squat, bend, stand or reach.  *Id.*  at 127.  However, Grogan also

noted Roberts shopped once or twice a month, did laundry at Grogan's house, prepared his own

meals, cared for two dogs, could walk a short distance, and follow instructions.  *Id.*  at 123-125,

127.  He noted Roberts ate mostly canned goods as he had no refrigeration, but this was not a

change.  *Id.*  at 124.  Grogan stated Roberts was depressed because of lack of money and medical

care.  He remarked that Roberts can't get out of bed as he has "nothing to look forward to" and

that "he just needs a little medical care so he's able to get back to work."  *Id.*  at 129.

The ALJ did not reject this testimony as it is not inconsistent with Roberts' RFC.  While

stating Roberts' had pain that prevented him from doing physical activities, Grogan also noted

Roberts  could walk, fix meals, shop, take care of pets, and do laundry.  Roberts' RFC limits him

to light duty with limitations regarding full grip strength.  It is not clear there are further

limitations that should be included in Roberts' RFC due to Mr.  Grogan's testimony.  Even if the

ALJ should have discussed this testimony, any error is harmless as the failure was not prejudicial

to Roberts and did not affect the determination of disability.  The court is confident that no

reasonable ALJ who credited this testimony would reach a different conclusion. *Stout v. Commissioner of the Soc. Sec. Admin.,* 454 F.3d 1050, 1056 (9th Cir. 2006), *Curry v. Sullivan,* 925 F.2d 1127, 1131 (9th Cir 1990).

The ALJ properly assessed Roberts' RFC. He evaluated the medical evidence and reached conclusions based on substantial evidence in the record. The ALJ assessed credibility and drew reasonable inferences regarding credibility. The ALJ's determination of Roberts' RFC is supported by substantial evidence in the record and free of legal error. The ALJ's RFC decision is therefore upheld. *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d at 1039-1040.

## IV.    Step Five

Roberts asserts the ALJ erred at step five of the sequential process by failing to consider all of his limitations in his questions to the vocational expert. At step five, the Commissioner must show that significant numbers of jobs exist which the claimant can perform. *Andrews v. Shalala*, 53 F.3d at 1043. An ALJ can satisfy this burden by eliciting the testimony of a vocational expert ("VE") with a hypothetical question that sets forth all the limitations of the claimant supported by the record. *Id.; Osenbrock v. Apfel*, 240 F.3d 1157, 1162-1163 (9th Cir. 2001).

Roberts contends the ALJ erred at step five because he elicited testimony from the VE with hypothetical questions that did not contain the limitations posited by FNP Guthridge, his physicians, and lay witness. As described above, the ALJ did not find the limitations described by FNP Guthridge credible. There are no other opinions that are inconsistent with Roberts' RFC and the hypothetical questions given to the VE. An ALJ is not required to incorporate limitations based on evidence that he properly discounted. *Osenbrock v. Apfel,* 240 F.3d at 1163-1165.

The ALJ considered all the evidence and framed her vocational hypothetical questions based on the limitations supported by the record as a whole.  The VE testified that Roberts could perform a significant number of jobs that exist in the national economy.  Admin. R. 35-40.  The ALJ's conclusion that Roberts is able to perform some work and is not disabled is supported by substantial evidence and free of legal error.

## **CONCLUSION**

Based on the foregoing, the ALJ's decision that Roberts does not suffer from a disability within the meaning of the Social Security Act is based on correct legal standards and supported by substantial evidence.  The Commissioner's final decision is AFFIRMED and the case is DISMISSED.

IT IS SO ORDERED.

DATED this  2nd day of June, 2010.


/s/ Garr M. King_____
Garr M. King
United States District Judge